# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                       **Case No. 06-CR-71**

**ESSIX McBRIDE**
        **Defendant.**

## DECISION AND ORDER

Defendant Essix McBride, charged with possession of a firearm as a felon contrary to 18 U.S.C. § 922(g), filed a motion to suppress alleging that the police unlawfully stopped his vehicle. The motion was assigned to a magistrate judge, who held a hearing and recommended denial of the motion. Defendant objects to the recommendation, requiring me to conduct a de novo review. Fed. R. Crim. P. 59(b)(3).

## I. FACTS

Milwaukee Police Officer Michael Pendergast testified that in January 2006 he was assigned to the gang investigation unit. (5/31/06 Tr. at 6-7.) On January 18, at about 12:16 a.m., Pendergast and his partner, Detective James Hutchinson, while conducting another investigation, were seated in an unmarked squad car at the southeast corner of 39th and Hampton Streets when Pendergast observed a gray Mazda driving eastbound on Hampton at a high rate of speed. (Tr. at 7-9.) Pendergast estimated that the vehicle was traveling 40-50 mph in a 30-35 mph zone. The vehicle made a sharp left turn from Hampton onto North 39th Street without signaling or slowing very much, and the front of the vehicle dipped down quite a bit as it turned. The officers decided to conduct a traffic

stop and proceeded after the Mazda, at which time it made a sharp right turn into a T-alley. (Tr. at 9-10.) The officers followed and observed the Mazda make a left turn to travel north in the alley, towards a dead end. (Tr. at 11-12.) The officers activated their squad lights and made one chirp of the siren. (Tr. at 12.) The Mazda stopped and the officers pulled behind. (Tr. at 12-13.)

Pendergast exited his squad and illuminated the inside of the Mazda with his flashlight, observing the driver (later identified as defendant) bend over in the front seat and appear to reach with his right hand. (Tr. at 13-14.) Pendergast approached and instructed defendant to show his hands. (Tr. at 15.) Defendant complied, and Pendergast opened the car door and asked defendant to exit, which he did. (Tr. at 16.) Pendergast walked defendant toward the rear of the car and asked him if there was anything illegal in the vehicle. (Tr. at 17; 30.) Pendergast testified that he asked that question because in his experience when someone is reaching around in the front of a vehicle they are either trying to retrieve something or hide something. (Tr. at 32.) Defendant replied, "let me explain." (Tr. at 17.) Defendant proceeded to state that earlier that night he had gotten into a confrontation with another man at Teutonia and Roosevelt, and the other man pulled a gun. Defendant stated that he left and went to the area of 55th and Hampton, picked up a firearm, and was on his way back to the area of 19th of Hampton, where the other man lived, to kill him. (Tr. at 18.) Pendergast had Hutchinson stand with defendant while he looked in the Mazda, observing a firearm on the floor, partially under the seat, where defendant had been reaching. (Tr. at 18-19.) Pendergast told Hutchinson to take defendant into custody for carrying a concealed weapon, and Pendergast recovered the gun from the car. (Tr. at 20.)

2

While waiting for a conveyance vehicle, Pendergast ran a check on defendant and learned that he was out on bail on another firearms case. (Tr. at 21.) On cross-examination, Pendergast admitted that he never issued defendant any traffic citations. (Tr. at 25.) Nor did he discuss with defendant why he had stopped him. (Tr. at 31-32.) On re-direct, Pendergast testified that he did not issue traffic tickets because, in his discretion, he felt that defendant had enough to deal with given the firearm charges he faced. (Tr. at 42.)

Defendant testified that he did signal before turning left from Hampton onto North 39th Street and that he was not speeding. (Tr. at 47-48.) He stated that he received no citations for speeding or making a left turn without signaling. (Tr. at 48-49.) He testified that he did not recall telling the officers about the confrontation with the other man in the area of Teutonia and Roosevelt, but he did recall telling them that he had picked up the gun in the area of 55th and Hampton. (Tr. at 51.)

## II. DISCUSSION

### A. Legal Standard

In Whren v. United States, 517 U.S. 806, 810 (1996), the Supreme Court held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." This is so even if the officers subjectively harbor some other motive for pulling the defendant over. Id. at 813.

Once an officer had made a lawful stop, he "may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). This is so regardless of whether the passenger has done anything unusual or suspicious. See

3

id. at 411-15. Further, although a traffic stop alone will not justify a search, see United States v. Brown, 188 F.3d 860, 864 (7th Cir. 1999), an officer may conduct a limited search of the vehicle for weapons based on reasonable suspicion that the driver is armed and dangerous, Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977). The Supreme Court has explained that:

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. [The] issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. If, while conducting a legitimate Terry search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.

Michigan v. Long, 463 U.S. 1032, 1049-50 (1983) (internal citations, quote marks and footnote omitted).

**B.    Analysis**

As the magistrate judge noted, the determination of whether the officers had a lawful basis for pulling defendant over presents a credibility contest. Pendergast testified that defendant was speeding and failed to signal a left turn, both possible violations of Wisconsin law. Wis. Stat. §§ 346.34(1)(b); 346.57(4). Defendant denied committing either traffic violation.

4

I agree with the magistrate judge that Pendergast was the more credible witness.[1] He testified clearly and consistently, and in detail about the events of January 18, 2006. He testified as to precisely what he saw, the nature of the traffic violations he believed defendant had committed, and what he did upon making those observations. Specifically, he testified that he observed defendant traveling at a high rate of speed, he estimated 40-50 mph in a 30-35 mph zone, and make a sharp left turn without sufficiently slowing, causing the front of the vehicle to dip down quite a bit as it turned. He also offered a detailed and consistent version of what happened after he pulled defendant over.

Defendant, on the other hand, offered only a bald denial that he had broken the law. Further, his testimony as to what he told the officers after the stop was unconvincing. He testified that he could not recall telling Pendergast about his confrontation with the other man near Teutonia and Roosevelt, but he did remember telling them that he had picked up the gun near 55th and Hampton.

I further note that there is no indication in the record that Pendergast was motivated to stop defendant as a pretext to search and seize any contraband in the vehicle. Pendergast was conducting another investigation at the time he happened to observe defendant driving too fast. Defendant, on the other hand, had a motive to testify that he did not violate the traffic code. As a felon, he faces serious penalties if found to have possessed a firearm.

---

[1] Defendant does not request that I conduct a de novo hearing. See United States v. Raddatz, 447 U.S. 667, 674-75 (1980) (holding that the district judge may, but is not required, to hold a de novo hearing before making a credibility determination).

Defendant argues that Pendergast did not ask for his driver's license upon conducting the stop, discuss with him the basis for the stop, or issue any traffic tickets, which is inconsistent with Pendergast's version of the stop. However, Pendergast credibly testified that once he saw defendant reaching towards the floor board as if to hide or retrieve something his focus shifted from a traffic stop to possible possession of contraband. It was entirely reasonable under the circumstances for Pendergast to focus on officer safety rather than the typical logistics of a traffic stop. Further, it was reasonable for Pendergast to decline to issue traffic tickets on top of the far more serious criminal charges defendant faced.

Defendant also notes that Pendergast's testimony was not corroborated by his partner. However, Hutchinson was not called to testify, so I do not find it helpful to speculate about what he may or may not have said. Further, it was Pendergast who primarily interacted with defendant.

Defendant further argues that Pendergast could not remember details about the interior of the Mazda. However, Pendergast never drove the car, and his focus was not on the location of the gear shift. Rather, his focus was on defendant's furtive movements, and his search was limited to the area where defendant hid the gun.

Finally, defendant argues that even accepting Pendergast's testimony, there was insufficient evidence that he committed a traffic violation. Specifically, he argues that because no traffic was affected by his left turn, he was not required to signal. See Wis. Stat. § 346.34(1)(b) ("In the event any other traffic may be affected by such movement, no person may so turn any vehicle without giving an appropriate signal in the manner provided

in s. 346.35").[2] However, Pendergast's testimony that defendant was speeding is clearly sufficient to establish probable cause for the stop. An officer may conduct a stop based on the reasonable belief that a driver has committed a traffic offense. United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000). Pendergast was parked at the southeast corner of 39th and Hampton when he saw defendant traveling eastbound on Hampton at a high rate of speed, then make a sharp turn onto 39th Street. (Tr. at 7-9.) He was clearly in a position to make reliable observations giving rise to a reasonable belief that defendant was speeding. Even though Pendergast could not provide defendant's precise speed, and even if he was in error about defendant's speed, the propriety of the traffic stop does not depend on whether defendant was actually guilty of committing the traffic offense. The pertinent question instead is whether it was reasonable for Pendergast to believe that defendant was speeding. Id. at 587. I find that it was.

Therefore, for all of these reasons and those stated by the magistrate judge, I find that the traffic stop of defendant's vehicle was constitutional. Once Pendergast stopped the vehicle, he was justified in ordering defendant to show his hands and get out. The stop occurred late at night, see United States v. Brown, 273 F.3d 747, 748 (7th Cir. 2001) ("A nighttime traffic stop . . . is more fraught with potential danger to an officer than would be a stop during the light of day."), and Pendergast observed defendant making suspicious movements, as if to hide or retrieve something, see United States v. Evans, 994 F.2d 317, 321 (7th Cir. 1993) ("The defendant's furtive gesture caused the officers to transform the general danger of the encounter into a specific fear that the defendant was armed."). Once

---

[2] Pendergast testified that there was little or no traffic on the roadway at the time. (Tr. at 9.)

7

defendant admitted that he had a gun in the car, the officers were clearly justified in recovering the weapon, and Pendergast limited the search "to the area that was the focus of the defendant's furtive gesture." Id. at 322. Once Pendergast found the firearm, the officers were entitled to arrest defendant for carrying a concealed weapon. See State v. Walls, 190 Wis. 2d 65, 71-73 (Ct. App. 1994) (holding that "a person is guilty of carrying a concealed weapon in an automobile where: (1) the weapon is located inside a vehicle and is within the defendant's reach; (2) the defendant is aware of the presence of the weapon; and (3) the weapon is concealed, or hidden from ordinary view--meaning it is indiscernible from the ordinary observation of a person located outside and within the immediate vicinity of the vehicle").[3]

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (Docket # 20) is **ADOPTED**, and defendant's motion to suppress (Docket # 8) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 14th day of July, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[3]Defendant does not separately argue that his statements on the scene and later at the police station should be suppressed based on a Miranda or other constitutional violation. Rather, he contends that they should be suppressed as the fruit of the unlawful stop. Because I have concluded that the officers acted lawfully in pulling defendant over, retrieving the gun and arresting defendant, the statements need not be suppressed.